KAREN P. HEWITT
United States Attorney
SHERRI WALKER HOBSON
Assistant U.S. Attorney
California State Bar No. 142947
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
sherri.hobson@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim Case No. 08-CR-0440-BTM |
| | ) | |
| Plaintiff, | ) | DATE: March 28, 2008 |
| | ) | TIME: 1:30 p.m. |
| v. | ) | |
| | ) | GOVERNMENT'S RESPONSE |
| | ) | AND OPPOSITION TO DEFENDANTS' |
| | ) | MOTION FOR DISCOVERY |
| **PETER MERTENS, ET AL,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and Sherri Walker Hobson, Assistant United States Attorney, and hereby files its response and opposition to defendants' motion for discovery..

**I**

**STATEMENT OF THE CASE**

On February 19, 2008, a federal grand jury returned a 40-count indictment, charging defendants Peter Carlo Mertens, Wayne Fernandes, William Hamman, and Bettina Thakore, with conspiracy to launder money, money laundering, conspiracy to structure cash deposits, and structuring of cash deposits (Attachment 1 - Indictment). The indictment is divided into two parts. The first part (counts 1-31) charges defendants Peter Mertens (CEO), Wayne Fernandes (the first accountant/bookkeeper), and William Hamman (the second bookkeeper) with conspiracy to launder money and aiding and abetting laundering of money (concealing and disguising drug

1  proceeds).  The second part of the indictment (Counts 31-40) charges defendants Mertens, Fernandes, Hamman, and Mertens' wife (Bettina Thakore) with structuring drug cash proceeds into multiple business and personal bank accounts. The indictment charges them with conspiracy to structure cash deposits and aiding and abetting  All four defendants posted their respective bonds and are currently out of the custody.

On March 6, 2008, defendant William Hamman filed a discovery motion and a motion for leave to file further motions. [Clerk's Record, 35].  On March 13, 2008, defendants Bettina Thakore and Wayne Fernandez, joined in that motion. [Clerk's Record 41, 42.]  On March 14, 2008, defendant Peter Mertens joined in that motion. [Clerk's Record 44].

## II

## STATEMENT OF FACTS

### A.     INTRODUCTION: THE PARTICIPANTS

From 2002 to 2005, during the money laundering scheme, defendant Peter Mertens was the President, Owner, Operator, Manager, and Executive of Diamond Golf Company, Inc., Diamond Golf, and Cal State Abrasives, located in San Diego County, California. Matthew Hausotter, who is charged elsewhere, was an associate and employee of defendant Peter Mertens and Diamond Golf Company, Inc., and Diamond Golf.  Ian Mahon, who was charged separately, was a drug trafficker who had substantial cash proceeds from manufacturing marijuana plants and distributing marijuana. (Hausotter and Mahon pled guilty; Mahon was sentenced and Hausotter is awaiting sentencing before this Court).

.     From February 2003 to September 2004, defendant Wayne Fernandez was an accountant for defendant Mertens' companies, including Diamond Golf Company. As part of his responsibility, defendant Fernandes signed and issued business checks on behalf of defendant Mertens companies, including Diamond Golf Company, Inc., Diamond Golf, PMS, and PITAH. One Diamond Golf bank account, PMS, and PITAH accounts, were opened during the money laundering scheme.

1   From 2001 to March 2005, defendant William Hamman worked for defendant Mertens'
2   companies, including Diamond Golf, and between September 2004 to March 2005, defendant
3   Hamman was also the accountant and/or bookkeeper, after defendant Fernandes left the company.
4   Defendant Hamman signed and issued business checks on behalf of defendant Peter Mertens'
5   companies.

6   **B.     THE CASH FOR CHECK MONEY LAUNDERING SCHEME**

7   Beginning in February 2003, and continuing each month until July 2005, (when Mahon got
8   arrested following the execution of multiple search warrants), and at the direction and agreement
9   of defendant Peter Mertens, Matthew Hausotter would obtain substantial bulk cash (between
10  $10,000.00 and $30,000.00 at a time), which represented drug proceeds from Mahon, who had
11  substantial cash proceeds from cultivating marijuana. During this 30-month period of the money
12  laundering scheme, Matthew Hausotter would deliver Mahon's drug proceeds to defendants
13  Mertens, Fernandes, or Hamman, from February 2003 and continuing to July 2005. After
14  Mahon's drug proceeds were delivered by Hausotter, defendant Mertens, Fernandes, or Hamman,
15  issued Diamond Golf business checks payable to Ian Mahon or Mahon and Company, for the
16  value of the cash, minus a 7% money laundering fee. Hausotter delivered Mahon's cash and also
17  obtained the Diamond Golf business checks. The accountants, who received the cash each month
18  from Hausotter and then wrote the checks payable to Mahon (minus the money laundering fee),
19  would also inform Hausotter when these checks could be deposited by Mahon, because they had
20  to move the cash around.

21  At the time they were writing checks to Mahon, after receiving the cash, the accountants
22  (defendants Fernandes and Hamman) knew that Mahon never worked for defendant Mertens or
23  any of his companies. Mahon never appeared in their offices or dropped by their business offices,
24  even though Mahon was clearly the "highest paid" employee or independent contractor for
25  Diamond Golf over a two year period. Moreover, the accountants knew that the "legitimate"
26  business of Diamond Golf was substantially declining and would never justify the substantial cash

delivered by Mahon. Plus, this was not a "cash-generating" business. In fact, Diamond Golf's "legitimate" business was declining at a time when Mahon's cash deliveries (through Hausotter) were increasing from $10,000 to $20,000 to $30,000 each month for the 30-month period.

By the end of the cash for check money laundering scheme (when Mahon got arrested in July 2005), Mahon had given Mertens approximately $500,000 in drug proceeds to launder. The following table outline 30 Diamond checks that were issued to Mahon during the 30-month scheme :

|   | Check # | Diamond Golf Check Date of Issuance | Amount of Check To Ian Mahon | Deposit Date By Mahon |
|---|---|---|---|---|
| 1 | 1005 | 02/14/2003 | 9,350.00 | 03/04/2003 |
| 2 | 1006 | 02/28/2003 | 9,350.00 | 03/04/2003 |
| 3 | 1011 | 03/20/2003 | 9,350.00 | 03/27/2003 |
| 4 | 1013 | 04/04/2003 | 9,300.00 | 04/10/2003 |
| 5 | 1020 | 04/25/2003 | 9,350.00 | 05/13/2003 |
| 6 | 1066 | 06/06/2003 | 9,350.00 | 06/13/2003 |
| 7 | 1082 | 06/17/2003 | 5,475.00 | 06/19/2003 |
| 8 | 1125 | 07/16/2003 | 4,650.00 | 07/26/2003 |
| 9 | 1173 | 08/01/2003 | 9,250.00 | 08/04/2003 |
| 10 | 1196 | 08/15/2003 | 9,250.00 | 08/19/2003 |
| 11 | 1240 | 09/10/2003 | 9,300.00 | 09/13/2003 |
| 12 | 4073 | 12/02/2003 | 9,300.00 | 12/03/2003 |
| **TOTAL YEAR 2003** | | | **$103,275.00** | |

| | | | | | |
|---|---|---|---|---|---|
| 13 | 4147 | 01/06/2004 | 9,300.00 | 01/17/2004 | |
| 14 | 4185 | 02/06/2004 | 18,600.00 | 02/09/2004 | |
| 15 | 4232 | 03/08/2004 | 18,600.00 | 03/09/2004 | |
| 16 | 4338 | 04/15/2004 | 18,600.00 | 05/21/2004 | |
| 17 | 4339 | 05/15/2004 | 18,600.00 | 05/21/2004 | |
| 18 | 4364 | 06/15/2004 | 18,600.00 | 06/16/2004 | |
| 19 | 4398 | 07/21/2004 | 18,600.00 | 07/23/2004 | |
| 20 | 4409 | 08/20/2004 | 18,600.00 | 08/28/2004 | |
| 21 | 4422 | 09/15/2004 | 18,600.00 | 09/26/2004 | |
| 22 | 4425 | 10/15/2004 | 18,600.00 | 10/18/2004 | |
| 23 | 4430 | 11/15/2004 | 18,600.00 | 11/16/2004 | |
| 24 | 4438 | 12/15/2004 | 18,600.00 | 12/21/2004 | |
| **TOTAL 2004** | | | | **$ 213,900.00** | |
| | | | | | |
| 25 | 4442 | 01/15/2005 | 18,600.00 | 01/24/2005 | |
| 26 | 4451 | 02/15/2005 | 18,600.00 | 02/16/2005 | |
| 27 | 4455 | 03/15/2005 | 27,900.00 | 04/19/2005 | |
| 28 | 4467 | 04/13/2005 | 27,900.00 | 05/12/2005 | |
| 29 | 4471 | 06/09/2005 | 27,900.00 | 06/09/2005 | |
| 30 | 4500 | 06/15/2005 | 27,900.00 | 07/07/2005 | |
| **TOTAL 2005** | | | | **$ 148,800.00** | |
| **GRAND TOTAL** | | **$ 465,975.00** | | | |

The first 19 checks (in yellow) were signed by defendant Fernandes while the 8 checks (20-27 in blue) were signed by defendant Hamman. The remaining three checks were signed by "William Hamman," but it does not appear to be his signature (Hamman had left the Diamond Golf company in March 2005).

Since Mahon (through Hausotter) gave defendant Mertens (and his accountants) approximately $500,000 in cash to launder, the 7% money laundering fee of $500,000 is approximately $35,000. The Diamond Golf checks that were issued to Mahon reflect that the accountants, who took the large cash deposits, subtracted the 7% money laundering fee when issuing the check.

During the cash-for-check money laundering scheme, defendants Mertens, Fernandes, and Hamman, opened multiple bank accounts (including Diamond Golf, PMS, PITAH) to make cash deposits or move cash around these different accounts. Many of the cash deposits were into these different accounts with deposits all under $10,000. On many occasions, the accountants would write checks from these different business accounts to Diamond Golf in order to over Mahon's business check. On other occasions, the accountants provided Mertens and his wife with the cash, because Merten's wife had substantial cash deposits during the scheme. At times, she would write checks to Diamond Golf to "cover" Mahon's business checks. By using these multiple accounts to deposit the cash (and writing checks from these accounts to cover Mahon's checks), the defendants were concealing and disguising the source of the cash by making multiple cash deposits

In addition, during the cash-for-check money laundering scheme, defendant Mertens authorized the issuance of IRS Forms 1099 to Ian Mahon for calendar years 2003 and 2004. In 2003, defendant Fernandes issued the IRS Form 1099 to Mahon in the amount of $112,575.00 as "non employee compensation" with the payer name as Cal State Abrasives, LLC, one of the companies owned and operated by defendant Mertens. In 2004, defendant William Hamman issued the IRS Form 1099 for Mahon and Company in the amount of $186,000.00 as "other income" with the payer name as Diamond Golf Company, one of the companies owned and

1  operated by defendant Mertens. Mahon would subsequently pay taxes to legitimate his income
2  By the end of the cash-for-check scheme, when Mahon got arrested, Mahon had purchased four
3  residences using the laundered funds as "income." (Mahon had no properties at the beginning of
4  this scheme). The defendants essentially legitimated Mahon's income and allows Mahon to
5  continue manufacturing marijuana.
6  In order to further conceal and disguise the criminal proceeds, defendants Mertens,
7  Fernandez, and Hamman structured and cause to be structured their financial transactions by
8  dividing large sums of bulk cash from Ian Mahon into smaller sums of less than $10,000.00, and
9  depositing or cause to be deposited these smaller sums of cash in separate financial transactions
10 over a period of time into multiple business and personal bank accounts associated with defendant
11 Mertens. All of the cash deposits over the 30-month period (totaling $510,000 – the same amount
12 of cash provided by Mahon) were less than $10,000 and structured. [Exhibit 2 – List of all cash
13 deposits into multiple bank accounts as part of the money laundering and structuring of deposits]
14 In addition, defendant Fernandes made cash deposits into his personal checking account (and
15 eventually issued checks to Bettina Thakore for the amount of the cash deposits into his person
16 account).

17     **C.    THE BIG COVER-UP STORY FOLLOWING MAHON'S ARREST**

18  Shortly after Mahon's arrest in July 2005, Hausotter, Mertens, Fernandes, and Hamman,
19 were very concerned about their situation. There were several meetings to discuss what to tell the
20 Government about the Diamond Golf checks that were issued to Ian Mahon since Mahon never
21 worked for the company. (Hausotter, Fernandes, and Hamman were no longer employees of
22 Mertens' companies but participated in these meetings). During the meetings, Mertens, Fernandes,
23 Hamman, and Hausotter, came up with the "big cover-up" story to tell the Government, when the
24 Government approached them about Mahon's Diamond Golf checks. When interviewed, they
25 were going to tell the Government that Mahon worked for Diamond Golf doing "IT" work, sales,

1 | e-bay, fax-blasting, and other work for the company. They were also going to make false "invoices" for Mahon's work to corroborate their story.

In order for the "big cover-up" story to work, Mertens pushed Hausotter to get Mahon involved in this "big cover-up" which eventually led to the October 5, 2005 meeting at Chili's restaurant between Mahon, Mertens, and Hausotter. This was a recorded meeting.

On October 5, 2005, during the meeting at Chili's in Vista, California, Mahon told Mertens and Hausotter about the pending charges, including drug trafficking and money laundering. Mahon explained that the money laundering charge related to the properties that he purchased. They discussed how they would coordinate their stories about Mahon's checks from Diamond Golf. If questioned about Mahon's checks, Mahon and Mertens agreed that they would tell the Government about Mahon's "computer work" for the golf company. The story followed that Mertens decided to downsize the golf company in order to start a different company. It was agreed that the story would be that Mahon stayed behind at the golf company and handled the downsizing and also sold golf clubs.

However, Mertens noted that Mahon's income was $30,000.00 each month by mid-2005. Mertens claimed that the government would be suspicious if they referred only to Mahon's computer work, so Mertens told Mahon that they would tell the Government that Mahon participated in sales (that is selling golf clubs on line through Ebay and direct marketing).

During the meeting, Mertens said that if the Government looked into his bank accounts, they would find the cash deposits in different accounts. Mertens said that they would be caught if they looked at these accounts.

Following this meeting, Hausotter said that Mertens was confident that Mahon would participate in the "big cover-up."

//

//

**1.   DEA/IRS Recorded Interview with Peter Mertens – December 20, 2005**

On December 20, 2005, defendant Mertens was interviewed by DEA and IRS. Mertens tracked the story as he discussed with Hausotter and Mahon during the October 5, 2005 meeting. This interview was recorded. Mertens said the following:

(a) Mertens stated that in late 2002, he was the owner of Purespin Golf, which made golf clubs and employed about 30 individuals at that time. Mertens claimed that he had to "split" the business between retail operations and direct marketing operations. Mertens needed help on the direct marketing operation so Mahon's name surfaced. Mertens was vague as to how he contacted Mahon. According to Mertens, Mahon owned a furniture store at that time in Solana Beach. Mahon told him about "logistics and system stuff" that he could do for Diamond Golf, a spin off of Purespin Golf, so Mahon started working for Mertens. Mertens stated that he met Mahon at a furniture store on Cedros Avenue, in Solana Beach, California. Mahon allegedly owned that business so Mertens decided to hire Mahon as a contractor or independent representative (NOTE: Mertens met Mahon through Hausotter at a golf course; Mertens never mentions Hausotter's name during the interview or how Hausotter delivered cash to the accountants).

(b) Mertens could not recall if Mahon had a contract. According to Mertens, Mahon was paid based on completed projects. Mahon was responsible for keeping track of his own hours. Mertens claimed that Mahon created websites, received orders and passed those orders to Los Angeles, and moved inventory. Mertens claimed that he did not supervise Mahon and could not identify who supervised Mahon. At one point, Mertens claimed that Mahon did "auction site stuff, this golf warehousing stuff, direct response." *[NOTE: Mahon never worked for Mertens or his companies; there was no contract and no invoices. Mertens acted consistently with the "big cover story"]*

(c) According to Mertens, Mahon would take his hours to the controller of Diamond Golf, Wayne Fernandes (and Hamman) and they would actually write out the checks to

Page 9 of 16

1    Mahon. *[NOTE: Mahon never worked for Mertens and never took any "hours" or "invoices" to
2    his accountants; Mertens and Mahon agreed to minimize their contact with each other prior to the
3    scheme and to use Hausotter to deliver the cash; both Mahon and Hausotter confirm that no
4    invoices were generated]*

      (d)    Mertens told the agents that Mahon worked for him until March 2005. According to Mertens, Mahon was paid over $100,000 for the entire period. *[NOTE: Mahon never worked for Mertens; Mertens continued issuing checks to Mahon until June 2005, not March 2005; Mertens issued $465,000 in checks to Mahon, not $100,000]*

      (e)    According to Mertens, Mahon was issued an IRS Form 1099 for each year that he worked for Purespin.

**2.     DEA/IRS Recorded Interview with Fernandes - January 25, 2006**

The "big cover story" continued when agents interviewed defendant Wayne Fernandes. Fernandes was interviewed on January 25, 2006 by the IRS and DEA agents. During the January 25, 2006- tape-recorded interview, Wayne Fernandes told the IRS and DEA agents the following:

      (a)    Fernandes worked for Diamond Golf (then Mertens' company) from late 1999 to August 2004. According to Fernandes, Peter Mertens was the owner of Diamond Golf, Purespin Golf and also owned Cal State Abrasives, but that business (Cal Abrasives) eventually moved back to Cincinnati.

      (b)    Fernandes stated that Ian Mahon was an "IT" guy that Peter Mertens hired to do various IT work for Diamond Golf. However, Fernandes never met Mahon. Fernandes believed that Mahon worked off-site and was connected to the computer network via VPN.

      (c)    Fernandes told the agents that he received "invoices" from Mahon through the mail. An administrative employee would then input the invoice amount into the accounting program which was Peachtree Accounting. Mertens should have copies of the invoices that were submitted by Mahon, Fernandes remembers Mertens having pallets full of records. *[NOTE: There were no invoices; Mahon never submitted invoices. Hausotter said that the only invoices that*

*Fernandes discussed was the "fake invoices" that were part of the "big cover story" that they were going to tell the Government.]*

      (d)    Fernandes claimed that he would receive a printed list of the accounts payable for the business and give that list to Mertens. According to Fernandes, Mertens would then circle or somehow mark which invoices to pay and give the list back to Fernandes. Fernandes would then write a check and sign it. *[NOTE: There was no list, no circling of accounts to pay, with Mahon. Hausotter delivered the cash to Fernandes who issued the Diamond Golf checks].*

      (e)    Since Fernandes never met Mahon, he believes that the checks were mailed to Mahon. *[NOTE: Fernandes issued 19 checks. Hausotter delivered cash to Fernandes, who then issued a Diamond Golf check, minus 7% money laundering. Fernandes never mailed these checks, but gave the checks to Hausotter; Fernandes never mentions Hausotter.]*

## III

## POINTS AND AUTHORITIES

### A. DEFENDANTS' MOTION TO COMPEL FURTHER DISCOVERY

The Government will continue to recognize its obligations under Brady v. Maryland, 373 U.S. 83 (1963), the Jencks Act (18 U.S.C. § 3500), and Rule 16 of the Federal Rules of Criminal Procedures. Defendants' additional discovery requests are addressed below.

      **1.    Defendants' Statements To Law Enforcement Agents**

With the exception of Bettina Thakore, defendants has made statements to law enforcement agents. The Government will provide reports of these interviews, transcripts of these recorded interviews, as well as the disc of these recorded interviews. The Government will also provide notes of the interviews where reports were not prepared and will further provide the grand jury testimony of one of the charged defendants.

### 2. Arrest Reports; Notes, and Dispatch tapes

The Government will provide any reports regarding the arrests of the defendants; the Government is not aware of any relevant dispatch tapes; the Government will have the agents preserve any notes of the interviews

### 3. Reports of Scientific Tests or Examinations

There is no fingerprint examinations in this case; however, handwriting exemplars were taken of defendant Mertens and Thakore pursuant to a grand jury subpoena; those results will be provided to the defense.

### 4. Criminal Records

The Government will provide any rap sheet related to the defendants. However, the Government does not believe that defendants have any prior criminal record.

### 5. Proposed 404(b) Evidence

The Government does not object to providing notice of any 404(b) evidence approximately three weeks before trial, as requested by the defendants.

### 6. Request for Preservation of Evidence

The Government seeks further clarification about the preservation of evidence from the defendants.

### 7. Tangible Objects Pursuant to Rule 16(a)(2)(c)

Defendants may inspect any evidence.

### 8. Disclosure of Cooperating Witnesses/Coconspirators

The Government has already disclosed the names of the two witnesses prepared to testify against the defendants. The Government will provide their statements (reports or notes) to interviewing agents, any grand jury testimony, plea agreements, cooperation agreements, any Brady information, and relevant reports related to these cooperating coconspirators. The Government will not provide any addresses of these witnesses.

### 9. The Government Will Comply With Its Obligation Under Brady v. Maryland

The Government is well aware of and will fully perform its duty under Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment. The defendant, however, is not entitled to all evidence known or believed to exist which is, or may be, favorable to him, or which pertains to the credibility of the Government's case. As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

> [T]he prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality.

611 F.2d at 774-775. See also, United States v. Sukumolachan, 610 F.2d 685, 687 (9th Cir. 1980) (the Government not required to create exculpatory material that does not exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure).

### 10. The Disclosure of Statements Prior To The Witness Testifying on Direct Examination At Trial

Production of witness statements is governed by the Jencks Act (18 U.S.C. § 3500) and need occur only after the witness testifies on direct examination. United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986), cert. denied, 479 U.S. 1094 (1986); United States v. Mills, 641 F.2d 785, 790 (9th Cir.), cert. denied, 454 U.S. 902 (1981). Indeed, even material believed to be exculpatory and therefore subject to disclosure under the Brady doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under the Act. See United States v. Bernard, 623, F.2d 551, 556-57 (9th Cir. 1979).

Further, the Government reserves the right to withhold the statements of any particular witnesses it deems necessary until after they testify. Otherwise, the Government will disclose the statements of witnesses, if it has not already done so, no later than one month prior to trial, provided that defense attorneys complied with their obligations under Federal Rules of Criminal

procedure 12.1, 12.2 and 16 and 26.2 and provided that defense attorney will turn over all "reverse Jencks" statements at that time.

### 11. Prior Wrongful Conduct Of Government Witnesses

The Government will provide the criminal convictions and prior material acts of misconduct, if any exist, of its trial witnesses as mandated in Giglio v. United States, supra, 405 U.S. 150 (1972). The Government will provide such impeachment material, if any, at the time it files its trial memorandum although it is not required to produce such material until after its witnesses have testified at trial or at a hearing. See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979).

### 12. Motives Of Government Witnesses

The Government agrees to provide information related to the bias, prejudice or other motivation of government trial witnesses as mandated in Napue v. Illinois, 360 U.S. 264 (1959). The Government will provide such impeachment material, if any, approximately one month prior to trial. At this time, the Government is unaware that prospective witnesses are biased or prejudiced against the defendant, or has a motive to falsify or distort their testimony.

### 13. Ability to Perceive; Any Drug or Alcohol Use by Government Witness

At this time, the Government is not aware of any evidence that any Government witness' ability to perceive is impaired by the use of controlled substance or alcohol.

### 14. Witness List

There is no requirement for the Government to supply defendants in a non-capital case with a list of the witnesses it expects to call at trial. United States v. Dischner, 974 F.2d 1502 (9th Cir. 1992)("we have consistently held that in noncapital cases, the government does not need to disclose the names of its witnesses prior to trial"); United States v. Thompson, 493 F.2d 305, 309 (9th Cir. 1974), cert. denied, 419 U.S. 835 (1974); United States v. Glass, 421 F.2d 832, 833 (9th Cir. 1969). However, the Government will provide a tentative list of the witnesses it expects to call at trial when it files its trial memorandum, approximately five days before trial.

### 15. Henthorn Review

The Government will conduct a "Henthorn" review of the testifying federal officers in this case.

### B. DEFENDANT MAY FILE FURTHER MOTIONS

The Government does not oppose defendants' filing further motions in this case.

### C. THE GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY SHOULD BE GRANTED

#### 1. Rule 16(b)

Defendants have invoked Federal Rule of Criminal Procedure 16(a) in their motions for discovery. Further, the Government will voluntarily comply with the requirements of Federal Rule of Criminal Procedure 16(a). Therefore, Rule 16(b) should presently be determined to be operable as to the defendants.

The Government, pursuant to Rule 16(b), hereby requests the defendants to permit the Government to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which are within the possession, custody or control of defendant and which they intend to introduce as evidence in their case-in-chief at trial. The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of the defendant, which he intend to introduce as evidence-in-chief at the trial or which were prepared by a witness whom the defendant intend to call as a witness. The Government also requests that the court make such orders as it deems necessary under Rule 16(d)(l) and (2) to insure that the Government receives the discovery to which it is entitled.

#### 2. Rule 26.2

Federal Rule of Criminal Procedure 26.2 requires the production of prior statements of all witnesses, except the defendants. The new rule thus provides for the reciprocal production of Jencks statements. The time frame established by the rule requires the statement to be provided

1  after the witness has testified, as in the Jencks Act.  Therefore, the Government hereby requests
2  that the defendant be ordered to supply all prior statements of defense witnesses by a reasonable
3  date before trial to be set by the court.  This order should include any form these statements are
4  memorialized in, including but not limited to, tape recordings, handwritten or typed notes and/or
5  reports.

## III

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that defendants' motions, except where not opposed, be denied and that the Government's motion for reciprocal discovery be granted.

DATED:  March 21, 2008.

                                      Respectfully submitted,

                                      KAREN P. HEWITT
                                      United States Attorney

                                      **S/Sherri Walker Hobson**
                                      SHERRI WALKER HOBSON
                                      Assistant U.S. Attorney
                                      **sherri.hobson@usdoj.gov**